————o————

STATE OF MISSOURI, *ex rel.* W. J. GILBERT, Relator, *vs.* MICHAEL K. McGRATH, SECRETARY OF STATE, Respondent.

1. *Missouri Sup. Ct. Reports—Cost of stereotyping and pay of reporter legitimate charges against State under act of* 1868—*Subsequent contract.*—The act of March.5th, 1868 (Adj. Sess. Acts 1868, p. 44), required the publisher of the Supreme Court Reports (§ 1) "to keep on hand a sufficient number of each volume of said reports, or to make such arrangements as to enable the legal profession of the State to obtain said reports at the prices fixed by said contract," and (§ 2) "to pay for the services of a reporter," etc. *Held,* that under that act, and the contracts made thereunder, by the State with W. J. Gilbert, as publisher, he was authorized to adopt the plan of stereotyping the several volumes, the stereotype plates to be preserved in order to meet any subsequent demand for the volumes, in case the edition in print should "run short," or become exhausted; and that the expense of stereotyping and the salary of reporter were essential parts of the cost of publishing the Reports, and the State was liable for its proportion thereof.

2. *Supreme Court Reports out of print—Contract for reprinting under act of March 8th,* 1873.—The act of March 8th, 1873, (Sess. Acts, 1873, p. 30) made it the duty of the Secretary of State to furnish missing volumes of the Supreme Court Reports to Circuit and County Clerks, and that officer was authorized under its provisions to contract with W. J. Gilbert to reprint such of those volumes as were out of print.

### *Petition for Mandamus.*

*Ewing & Smith,* for Relator.

The resolution under which Gilbert made his contract (Sess. Acts 1873, p. 407), gave him authority as provided in the act of 1868 (Adj. Sess. Acts 1868, p. 44). That act provides that the Reports shall be published " at the actual cost of the volumes, with ten per cent. added," and we contend, that :

I. The item of $750.00 per volume for salary of Reporter, in the publisher's account, is part of the "actual cost." (*a.*) The

services of reporter are as essential to the publication as the binding or setting of type. (*b.*) The contract itself expressly provides that the salary shall be part of the actual cost. (*c.*) The former contract was so understood and treated. (*d.*) The State having paid for like items under the previous contract, and having accepted and previously paid for books under the present contract, is estopped from denying the construction for which we contend.

II. The stereotyping is a legitimate part of the cost of publication. Under the act of 1868 the publisher is required "to keep on hand a sufficient number of each volume of said Reports, or to make such arrangements as to enable the legal profession of this State to obtain said Reports at the prices so fixed by said contract." This provision can never be complied with except by preserving stereotype plates of each volume published. To insist that at the outset the publisher should print enough numbers of each volume to meet all future contingencies of demand and loss, would be a requirement unreasonable to demand, and impossible to comply with.

III. The contract for the missing volumes is in strict accordance with the act of March 8th, 1873, and there can be no objections to it. Besides, it has been repeatedly acted upon, and books have been delivered and paid for under it. And at this time it is too late to question its legality.

*Jno. A. Hockaday, Att'y Gen'l,* for Respondent.

I. The State is not liable for the payment of the reporter, under the act of March, 1868. The second section requires the publishers of the Mo. Reports to contract with and pay such reporter. The services of the reporter constitute no part of the mechanical work of printing and binding the Reports, and the above act never contemplated making the State liable therefor. (Adj. Sess. Acts 1868, p. 44.)

II. The State is not liable to the contractor for the stereotyping of the reports already published. This is done solely for the convenience and benefit of the contractor; the State

receives no benefit therefrom, and ought not to be held liable therefor.

III. The act of March 8th, 1873, (Sess. Acts 1873, p. 30) never authorized the Secretary of State to go into a contract for the publication of the missing volumes of the Reports, and such contract cannot be enforced against the State.

IV. Although the Secretary of State may have attempted to bind the State in the written contract to pay for a reporter, yet if the law did not authorize such contract, the same is wholly void, and the fact that he afterwards allowed the claim for reporter's services, and that the same was paid, does not estop the State from denying its liability now. An agent of the State must comply strictly with the authority given him.

NAPTON, Judge, delivered the opinion of the court.

This is an application for a mandamus on the Secretary of State, requiring him to certify certain accounts presented by the publisher of the reports of the Supreme Court. These accounts and charges against the State grew out of two contracts made by Mr. Weigel, the predecessor of the present Secretary, with the plaintiff.

The first contract was executed April 10th, 1873, and purports to have been made by virtue of a concurrent resolution of the General Assembly, approved March 24, 1873. By this contract the publisher agreed to furnish such a number of volumes of the reports as might be needed by the State, at the actual cost and ten per cent., but the price was not to exceed $3.75 per volume. The contract specified particularly the style of printing, binding, etc. The publisher was required "to keep on hand a sufficient number of each volume of said reports, or make such other arrangements as may be necessary to enable the legal profession of this State to obtain said reports at $4 per volume." It is further agreed and understood " that the party of the second part (the publisher) is to and shall pay for the services of the reporter such compensation as may be agreed on or stipulated by the party of the

second part and the reporter—a just proportion of the expense so incurred, taking into consideration the whole number of volumes published, to be computed in ascertaining the cost of the volumes furnished the State."

Under this contract the bill of the publisher is made out for the copies of volumes 57, 58 and 59, furnished the State, at the rate of $3.75 per volume, at the same time furnishing the Secretary with an estimate of the cost, which exceeds that price. The only objection to the bill of costs is to two items, the one for stereotyping ($600) and the other for pay of reporter, which is $750.

The second contract is dated Oct. 30, 1874, and is also made with the former Secretary. By this contract Mr. Gilbert agrees to " sell to the State 200 copies of certain volumes of the reports,"—naming them—at $4.00 per volume, and among them certain volumes recited as being *out of print*—the last to be reprinted and delivered at a specified day. Under this contract the publisher offered 200 copies of the 40th vol. of reports at $800. The present Secretary (Mr. McGrath), rejects these volumes on the ground that the second contract was not authorized by law.

The objections to the bill of costs furnished by the publisher on the first contract are that the items for stereotyping and for the expense of employing a reporter, are not within the contract, and if within the contract, are not authorized by law.

We have examined the acts on this subject, and think the Secretary (Weigel) had authority to make the contract he did. The act of March 3, 1868, (p. 44) is the authority for the contract. That act required, among other things, that the contract which it required the Attorney-General and Secretary of State to make, should "contain a provision requiring said publisher to keep on hand a sufficient number of each volume of said reports, or to make such arrangements as to enable the legal profession of the State to obtain said reports at the price so fixed by said contract." The Secretary, in his contract, followed the very terms of the act.

The publisher, instead of printing several hundred or a thousand copies which might never be needed, adopted the plan of stereotyping each volume, by which he could, with only the additional expense of paper and press work, at any time increase the number of copies which the State or the profession might need. What mode he might adopt to enable him "to keep on hand a sufficient number of each volume" to meet the requirements of the State and of the profession, was not specified in the law or in the contract. It is apparent that stereotyping was a reasonable and proper one, and that it saved the State, and every one who wished to buy the reports, exorbitant charges for volumes that might be otherwise out of print. We see no objection to this item as a part of the cost.

In regard to the reporter's salary, the contract is specific. The publisher was bound by the act of 1868, to pay a reporter, and his salary was a part of the expense which the publisher assumed. He had no right, under his contract, to charge the State in his estimate of costs, more than the proportionate amount of this salary. We suppose, under the statements in this case, that he did not, as this item was rejected on the ground that the State was not responsible for any portion of the reporter's salary. In the estimate of costs this salary was clearly admissible, as constituting an essential part of the publisher's costs.

In regard to the second contract, it is insisted that the Secretary had no authority to make such a contract. The act of March 8, 1873, declares it to be the duty of the County and Circuit Courts to collect certain volumes of reports heretofore furnished them, and a certified copy is ordered to be sent to the Secretary of State; and then it is provided "that when it shall appear from such certified copy of such list that any of the clerks have not a complete set of said reports of the decisions of the Supreme Court, then said Secretary shall purchase said reports of the decisions of the Supreme Court as may be necessary to make out a complete set of such reports, and furnish them to said clerks."

The authority, or rather the duty, to purchase reports under the circumstances mentioned, was imposed on the Secretary of State by this act, and under this act the contract was made in regard to certain volumes out of print, that they should be reprinted, and that the publisher should be allowed $4 per volume. We see nothing unreasonable in this contract. The Secretary was bound to furnish the missing volumes to the different clerks reported to him as being without them, and there is no restriction in the law as to the mode he might adopt to procure them. In regard to such volumes as he was satisfied were not to be obtained by purchase, he contracted for a reprint, and the price he agreed to pay was only 25 cents over the price he had agreed to pay for new reports. We are unable to see that the Secretary (Weigel) exceeded his powers in either of these contracts. We are therefore of opinion that the present Secretary of State should comply with the contracts of his predecessor, and allow the claims presented.

Peremptory mandamus allowed. Judge Vories absent. The other judges concur.